**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN ROSE, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br>v.<br><br>NEW YORK CITY HEALTH AND HOSPITALS, CORP.,<br><br>Defendant. | No.<br><br>**COMPLAINT – CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

Plaintiff Steven Rose ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class" or "Class Members") against Defendant New York City Health and Hospitals, Corp. ("NYC Health+" or "Defendant"), and alleges as follows, based upon information and belief, the investigation of counsel, and the personal knowledge of Plaintiff.

## NATURE OF THE CASE

1. This data breach case involves the unauthorized access and exfiltration of highly sensitive personally identifiable information ("PII") and protected health information ("PHI") (collectively "Private Information") belonging to millions of individuals, including Plaintiff and Class Members.

2. NYC Health+ is the nation's largest municipal health care delivery system, serving patients in over 70 locations across New York City.[1] During the ordinary course of its business, NYC Health+ solicits, collects, and stores an enormous amount of Private Information, generating over $12 billion in annual revenue.

3. The Private Information stored on Defendant's systems includes a broad array of sensitive PII and PHI, including, according to Defendant's Patient Privacy Notice: "any

[1] https://www.nychealthandhospitals.org/about-nyc-health-hospitals/ (last visited August 4, 2026).

individually identifiable information which is created, received, maintained or transmitted by the System, and which concerns your health care and treatment, and payment for such care and treatment."[2]

4. On or about February 2, 2026, NYC Health+ became aware of a cyberattack on its network lasting for eleven weeks between November 25, 2025 and February 11, 2026, which resulted in the exfiltration of troves of Private Information from NYC Health+'s network (the "Data Breach").

5. Upon information and belief, the Data Breach was perpetrated by Leaknet, a data extortion operation that has been active since late 2024. Leaknet operates a dedicated dark web leak site, Leaknet Blog, and file servers accessible exclusively through the Tor network. Leaknet functions as a double extortion threat actor that steals data and uses it as leverage in ransom negotiations.

6. The Data Breach was a direct and proximate result of Defendant's failure to implement fundamental and basic security measures that could have prevented the Data Breach.

7. In a public notice, posted to its website on March 24, 2026, NYC Health+ provided limited information concerning the Data Breach.[3] Specifically, NYC Health+ advised that "an unauthorized actor accessed certain NYC Health + Hospitals' systems" for several weeks between November 2025 and February 2026 and that, Defendant's investigation to date revealed, the Data Breach occurred "due to a security breach at a third-party vendor."[4]

8. NYC Health+ confirmed that the Private Information stolen in the Data Breach included: ***medical information*** (medical record numbers, disability codes, ***diagnoses***, ***medications***, test results, images, treatment plans), ***health insurance information*** (plans/policies, insurance companies, member/group ID numbers, Medicaid-Medicare-government payor ID

---

[2] *NYC Health+ Patient Privacy Notice*, nyc-health-hospitals-patient-privacy-notice.pdf (last visited August 4, 2026).

[3] https://www.nychealthandhospitals.org/pressrelease/notice-of-data-breach/ (last visited August 4, 2026).

[4] *Id.*

numbers), ***billing/claims information***, ***biometric information*** (fingerprints & palm prints), ***personal information*** (names, ***Social Security numbers***, driver's license numbers or other government-issued identification numbers, taxpayer identification numbers or IRS-issued identity protection numbers), ***precise geolocation data***, and financial information (***credit or debit card numbers***, ***financial account information*** or credentials, online account credentials).[5]

9. Upon information and belief, following the Data Breach, Leaknet published samples of the myriad types of Private Information it stole from Defendant on its dark web Tor website. As a result of the Data Breach, Plaintiff's and Class Members' highly sensitive Private Information is now in the hands of—and available in perpetuity to—cybercriminals.

10. Upon information and belief, 11TB of documents stolen from Defendant in the Data Breach reveal that the publicly reported number of impacted individuals by Defendant, 1.8 million people, undercounts the number of victims by millions of individuals. The documents stolen in the Data Breach span several years of patient data. On or about February 2, 2026, Defendant was in receipt of communications that at least 12 million current and former NYC Health+ patients were affected by the Data Breach.

11. The breadth and sensitivity of the Private Information stolen from Defendant in the Data Breach is staggering. Preliminary review and analysis of the documents leaked in the Data Breach to date reveal that over 8 million patients had their Social Security numbers ("SSNs"), names, dates of birth, addresses, and medical information stolen. 300,000 patients had their HIV diagnoses stolen. Thousands of women had their confidential abortion records stolen. The transgender patient registry for over 30,000 individuals was stolen. Suicide attempt treatment records for over 1 million patients were stolen. Rape, sexual assault, and sexual harassment incident reports, including photos and intimate details were stolen. Psychiatric evaluations for over 50,000 people were stolen. Forensic reports and autopsy reports were stolen. DNA information and fingerprint scans were stolen. Scans of Social Security cards and Driver's licenses were stolen.

---

[5] *Id.*

And patients' billing and financial information was stolen.

12. The Data Breach was the second of three cyberattacks NYC Health+ has disclosed in 2026 alone, with its most recent cyberattack occurring in March 2026.[6] "The pattern suggests [Defendant's] third-party vendor relationships have become a recurring point of vulnerability throughout the year."[7] Sensitive Private Information obtained in the most recent cyberattack experienced by Defendant was published on the dark web in April 2026.[8]

13. Plaintiff's and Class Members' Private Information has already or will be published for sale on the dark web, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

14. As a result of the Data Breach, Plaintiff has suffered numerous injuries, including invasion of privacy, lost time and expenses mitigating the risk of data misuse, the diminution in value of his Private Information, and loss of the benefit of his bargain with Defendant. Plaintiff and Class Members are additionally exposed to a significant and continued risk of future harm, including fraud and identity theft.

15. Plaintiff brings this action to hold Defendant accountable for its data security failures, to enjoin Defendant's continued failure to implement basic and fundamental data security practices, and to recover damages and all other relief available at law on behalf of himself and all similarly situated individuals.

## PARTIES

### A. Defendant

16. NYC Health+ is the nation's largest municipal health care delivery system, operating 70 locations across New York City's five boroughs. NYC Health+ is a public benefit corporation, headquartered with its principal place of business in New York City, New York. NYC Health+ is a citizen of the State of New York.

---

[6] https://distilinfo.com/2026/07/15/nyc-health-hospitals-data-breach/ (last visited August 4, 2026).
[7] *Id.*
[8] *Id.*

**B. Plaintiff**

17. Plaintiff Steven Rose is a citizen and resident of New York, New York. At all Plaintiff Rose has been a patient of Defendant since 2025.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because at least one member of the putative Class is a citizen of a different state than Defendant.

19. This Court has personal jurisdiction over Defendant because NYC Health+ maintains its headquarters and principal place of business in this District. Further, Defendant conducts substantial business in this District, engaged in the conduct at issue in this District, and otherwise has substantial contacts with this District and purposely availed itself of the Courts in this District.

20. Venue is proper in this District under 28 U.S.C. §§ 1391(a)(1)-(2), 1391(b)(1) and (2), and 1391(c)(2) because NYC Health+ is a resident of the State of New York, has its principal place of business in this District and because a substantial part of the events giving rise to the claims in this action emanated from activities within this District.

## FACTUAL ALLEGATIONS

**I. Defendant's Business**

21. NYC Health+ is "an integrated network of hospitals, community-based health centers, long-term care and rehabilitation facilities, home care services, correctional health services and a health plan, MetroPlus."[9] NYC Health+ treats "more than one million patients every year in more than 70 patient care locations across the five boroughs of New York City."[10]

[9] https://www.nychealthandhospitals.org/about-nyc-health-hospitals/ (last visited August 4, 2026).
[10] *Id.*

22. During the ordinary course of business, Defendant solicits, collects, and stores the Private Information of millions of patients, customers, and employees, including Plaintiff and Class Members, on its computers and networks.

23. Defendant's marketing and Notice of Privacy Practices demonstrate its awareness that data security is a key component of the services it provides. The following examples illustrate how Defendant markets the strength of its data security practices to entice individuals to use Defendant's products and services, as well as Defendant's awareness of industry guidance and regulations that set standards for effective data security practices:

> Defendant represents that "***The protection of your health information and maintaining confidentiality are a top priority for us***" and identifies their Chief Corporate Compliance Officer as being "responsible for ***ensuring the confidentiality, integrity***, and availability ***of patient information, and compliance with the privacy and security requirements under Federal and State laws***, including the Health Insurance Portability and Accountability Act (HIPAA)."[11]

## II. Defendant Obtains, Collects, Uses, and Derives a Benefit from Plaintiff's and Class Members' Private Information

24. Defendant obtains, collects, uses, and derives a benefit from the Private Information entrusted to it by Plaintiff and Class Members. Defendant uses Plaintiff's and Class Members' Private Information to provide services and products, generating revenue therefrom. Defendant would not be able to obtain revenue if not for its acceptance and use of this Private Information.

25. Plaintiff and Class Members entrusted their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep their highly sensitive information confidential and secure from unauthorized access.

26. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on the

---

[11] *NYC Health+ Notice of Privacy Practices*, https://www.nychealthandhospitals.org/patient-privacy-notice/ (last visited August 4, 2026).

sophistication of Defendant to keep their Private Information confidential and securely maintained, to use their information for necessary purposes only, and to make only authorized disclosures of their information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

27. By collecting Plaintiff's and Class Members' Private Information, either directly or indirectly, Defendant assumed legal and equitable duties to Plaintiff and the Class to protect and safeguard their Private Information from unauthorized access and intrusion.

28. Defendant had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 *et seq.* (the "FTC Act"), the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), contract, industry standards, and representations made to Plaintiff and Class Members, to keep the Private Information stored on its systems confidential and to protect that Private Information from unauthorized access and disclosure.

29. Defendant recognizes these obligations in its publicly posted HIPAA Privacy Notice, Notice of Privacy Practices, and marketing materials.

30. Defendant's assurances of maintaining high standards of cybersecurity indicate that Defendant recognized it had a duty to use reasonable measures to protect the Private Information it collected and maintained.

31. Defendant violated its own privacy statements and representations and failed to adopt reasonable and appropriate data security practices and procedures, including administrative, physical, and technical controls to safeguard Plaintiff's and Class Members' Private Information.

32. As a result, Plaintiff's and Class Members' Private Information was accessed and stolen from Defendant's inadequately secured systems in the Data Breach.

## III. The Data Breach

33. On or about February 2, 2026, NYC Health+ became aware of the Data Breach. Defendant confirmed that the unauthorized intrusion lasted for eleven weeks between November 25, 2025 and February 11, 2026 and resulted in the exfiltration of troves of Private Information from NYC Health+.

34. The Data Breach was the second of three cyberattacks NYC Health+ has disclosed in 2026 alone, with its most recent cyberattack occurring in March 2026.[12]

35. Upon information and belief, the Data Breach was perpetrated by Leaknet. Following the Data Breach, Leaknet published samples of the myriad types of data it stole from Defendant on its dark web Tor website, Leaknet Blog.

36. Upon information and belief, in total, 11TB of documents were stolen from Defendant in the Data Breach, spanning several years of patient data, and including Private Information belonging to approximately 12 million current and former NYC Health+ patients.

37. Preliminary review and analysis of the documents leaked in the Data Breach to date reveal that over 8 million patients had their SSNs, names, dates of birth, addresses and medical information stolen. 300,000 patients had their HIV diagnoses stolen. Thousands of women had their confidential abortion records stolen. The transgender patient registry for over 30,000 individuals was stolen. Suicide attempt treatment records for over 1 million patients were stolen. Rape, sexual assault, and sexual harassment incident reports, including photos and intimate details were stolen. Psychiatric evaluations for over 50,000 people were stolen. Forensic reports and autopsy reports were stolen. DNA information and fingerprint scans were stolen. Scans of Social Security cards and Driver's Licenses were stolen. And patients' billing and financial information was stolen.

38. In a public notice, posted to its website on March 24, 2026, NYC Health+ provided limited information concerning the Data Breach.[13] Specifically, NYC Health+ advised that "an unauthorized actor accessed certain NYC Health + Hospitals' systems" for several weeks between November 2025 and February 2026 and that, Defendant's investigation to date revealed, the Data Breach occurred "due to a security breach at a third-party vendor."[14]

[12] https://distilinfo.com/2026/07/15/nyc-health-hospitals-data-breach/ (last visited August 4, 2026).

[13] https://www.nychealthandhospitals.org/pressrelease/notice-of-data-breach/ (last visited August 4, 2026).

[14] *Id.*

39. NYC Health+ confirmed that the Private Information stolen in the Data Breach included: ***medical information*** (medical record numbers, disability codes, ***diagnoses***, ***medications***, test results, images, treatment plans), ***health insurance information*** (plans/policies, insurance companies, member/group ID numbers, Medicaid-Medicare-government payor ID numbers), ***billing/claims information***, ***biometric information*** (fingerprints & palm prints), ***personal information*** (names, ***Social Security numbers***, driver's license numbers or other government-issued identification numbers, taxpayer identification numbers or IRS-issued identity protection numbers), ***precise geolocation data,*** and financial data (***credit or debit card numbers, financial account information*** or credentials, online account credentials).[15]

40. Omitted from Defendant's Notice of Data Breach is any detail about the root cause of the Data Breach, the vulnerabilities exploited by the threat actor, or the remedial measures Defendant has undertaken to ensure a similar data breach does not occur again. To date, these critical facts have not been provided to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

41. NYC Health+'s purported "disclosure" amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members, with any degree of specificity, of the critical facts about the Data Breach. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

42. Defendant failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access and exploitation. The risk of cyberattacks, like the Data Breach, was well known to Defendant. Defendant could have taken, but did not take, simple and available data security measures to prevent the Data Breach.

43. Defendant's actions and inactions represent a flagrant disregard of the rights of Plaintiff and the Class.

---

[15] *Id.*

## IV. Relevant Industry Standards and Regulations for Data Security

### A. Department of Health and Human Services Warnings

44. Despite the growing body of publicly available information regarding the rise of ransomware attacks and other forms of cyberattacks that compromise Private Information, Defendant's approach to maintaining the privacy of Plaintiff's and Class Members' Private Information was inadequate, unreasonable, negligent, and reckless. Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information Defendant was collecting, storing, and maintaining for Plaintiff and Class Members, including adequately training employees.

45. Defendant's negligence or reckless or knowing disregard of its obligations to safeguard the Plaintiff's and Class Members' Private Information is evinced by the repeated warnings and data security alerts of which Defendant reasonably should have been aware, especially in light of the substantial increase in cyberattacks and data breaches in the healthcare and health insurance industries in the years preceding the date of this attack.

46. On July 30, 2021, the U.S. Department of Health and Human Services ("HHS") issued an alert about potential threats to healthcare organizations from cyberattacks.[16] Referring to the increasing risks as a "nightmare," HHS recommended that healthcare organizations review the list of recommended mitigations in the July 2021 Alert and promptly apply them to impacted systems in their infrastructure.[17]

47. On August 25, 2021, the HHS Cybersecurity Program published another Alert entitled "Indicators of Compromise Associated with Hive Ransomware."[18] The Alert was widely

---

[16] *See* HHS Cybersecurity Program H3: Section Alert (August 4, 2021), HiveNightmare/SeriousSAM Potential HPH Impact, https://www.hhs.gov/sites/default/files/sector-alert-hive-nightmare-serious-sam-tlpwhite.pdf.
[17] *See id.*
[18] *See HHS Cybersecurity Program HC3: Alert* (August 25, 2021), *www.hhs.gov/sites/default/files/iocs-associated-with-hive-ransomware-alert.pdf.*

circulated and reported on by the media after its release.[19] HHS noted that unauthorized parties had targeted entities in the healthcare and public health sector. The Alert, issued in conjunction with the FBI, described recommendations to detect, avoid, and recover from unauthorized party intrusions.[20] The Alert contains a list of specific, technical indicators that would immediately advise companies, like NYC Health+, that a system had been compromised, recognizing that awareness of these indicators could allow for detection during an attack and help contain or minimize its impact.[21]

48. A Flash Alert issued by the FBI on September 12, 2025, also contained recommended mitigations that companies, like NYC Health+, should immediately undertake:

- Back-up critical data offline.
- Ensure copies of critical data are in the cloud or on an external hard drive or storage device.
- Secure your back-ups and ensure data is not accessible for modification or deletion from the system where the data resides.
- Use two-factor authentication with strong passwords, including for remote access services.
- Monitor cyber threat reporting regarding the publication of compromised VPN login credentials and change passwords/settings if applicable.
- Keep computers, devices, and applications patched and up-to-date.
- Install and regularly update anti-virus or anti-malware software on all hosts.[22]

Upon information and belief, Defendant failed to adopt these and other recommended mitigations.

---

[19] *See* FBI Flash TLP White: Indicators of Compromise Associated with Hive Ransomware – August 25, 2021, American Hospital Association (August 25, 2021), www.aha.org/fbi-tlp-alert/2021-08-25-fbi-flash-tlp-white-indicators-compromise-associated-hive-ransomware.
[20] *See id.*
[21] *See* HHS Cybersecurity Program HC3: Analyst Note (April 18, 2022), www.hhs.gov/sites/default/files/hive-ransomware-analyst-note-tlpwhite.pdf.
[22] *Id.* at 7-8. The August Alert also contains links to additional resources to prevent, protect against, and respond to ransomware events.

49. As another HHS analysis points out: "When defending against Hive or any other ransomware variant, there are standard practices that should be followed. Prevention is always the optimal approach. This includes but is not limited to the following: Use two-factor authentication with strong passwords – this is especially applicable for remote access services such as RDP and VPNs." HHS recommendations also include:

- Sufficiently backing up data, especially the most critical, sensitive and operationally necessary data is very important. We recommend the 3-2-1 Rule for the most important data: Back this data up in three different locations, on at least two different forms of media, with one of them stored offline.

- Continuous monitoring is critical and should be supported by a constant input of threat data (open source and possibly proprietary as well).

- An active vulnerability management program must be comprehensive in scope and timely in implementation of the latest software updates. It should apply to traditional information technology infrastructure as well as any medical devices or equipment that is network-connected.

- Endpoint security should be comprehensive in scope and updated with the latest signatures/updates aggressively.[23]

50. Despite numerous warnings from the federal government informing healthcare organizations, like Defendant, of the threat posed by cyberattacks, including detailed recommendations to help companies prepare for and prevent such attacks, Defendant was negligent, reckless, or intentionally tortious in its failure to take steps to adequately prepare for and prevent the Data Breach.

51. Upon information and belief, Defendant failed to: employ multi-factor authentication; require strong passwords; sufficiently arrange for back up data to be stored in a safe location that could be quickly brought back on line; engage in continuous system monitoring or otherwise set up a system that would identify and prevent access from an increase in

[23] HHS Cybersecurity Program HC3: Analyst Note, *supra*.

unauthorized account access; acquire or implement an active vulnerability management program or comprehensive endpoint security measures that would have detected an unauthorized intrusion.

**B. Defendant Knew or Should Have Known of the Risk Because Healthcare Entities in Possession of Private Information Are Particularly Susceptible to Cyberattacks**

52. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting healthcare companies that collect and store Private Information, like Defendant, preceding the date of the Data Breach.

53. Data breaches, including those perpetrated against healthcare entities that store Private Information on their systems, have become widespread. Recent high profile cybersecurity incidents at other healthcare partner and provider companies include: TriMed (March 2026), UFP Technologies (January 2026), Episource (5 million patients, January 2025), Inotiv Inc. (August 2025), Change Healthcare (192 million patients, February 2024), HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8 million patients, March 2023), PharMerica Corporation (5 million patients, March 2023), HealthEC LLC (4 million patients, July 2023), ESO Solutions, Inc. (2.7 million patients, September 2023), Prospect Medical Holdings, Inc. (1.3 million patients, July-August 2023). Accordingly, Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

54. Defendant knew and understood that Private Information in the custody of healthcare entities, like NYC Health+, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that Private Information through unauthorized access.

55. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

56. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

57. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures to protect and secure the Private Information stored and maintained on its systems.

58. The ramifications of Defendant's failure to adequately secure and protect Plaintiff's and Class Members' Private Information are long lasting and severe. Once Private Information is stolen—particularly PHI—fraudulent use of that information and damage to victims may continue for years.

**C. Data Breaches are Preventable**

59. Despite the growing body of publicly available information regarding the rise of ransomware attacks and other forms of cyberattacks that compromise Private Information, Defendant's approach to maintaining the privacy of Plaintiff's and Class Members' Private Information was inadequate, unreasonable, negligent, and reckless. Defendant failed to use reasonable data security procedures and practices appropriate to the nature of the sensitive information it collected and stored, which resulted in the exposure and theft of Plaintiff's and Class Members' Private Information in the Data Breach.

60. As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[24]

61. Defendant could have prevented this Data Breach. Defendant could and should have implemented measures—as recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including, but not limited to, the following:

- **Implement an awareness and training program**. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

[24] Ransomware Prevention and Response, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- **Enable strong spam filters** to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- **Scan all incoming and outgoing emails** to detect threats and filter executable files from reaching end users.

- **Configure firewalls** to block access to known malicious IP addresses.

- **Patch operating systems, software, and firmware on devices**. Consider using a centralized patch management system.

- **Set anti-virus and anti-malware programs to conduct regular scans automatically**. Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage the use of privileged accounts based on the principle of least privilege**: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- **Configure access controls**—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- **Disable macro scripts from office files transmitted via email**. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- **Implement Software Restriction Policies (SRP)** or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop protocol (RDP)** if it is not being used.

- **Use application whitelisting**, which only allows systems to execute programs known and permitted by security policy.

- **Execute operating system environments or specific programs in a virtualized environment**. Run sensitive systems or programs in isolated virtual environments to reduce risk.

- **Categorize data based on organizational value** and implement physical and logical separation of networks and data for different organizational units.[25]

62. To prevent and detect cyberattacks and ransomware attacks, Defendant could and should have implemented the following preventive measures, as recommended by Microsoft's Threat Protection Intelligence Team:

- **Secure internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audits
  - Remove privileged credentials

- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**
  - Ensure collaboration among security operations, security admins, and information technology admins to configure servers and other endpoints securely

- **Build credential hygiene**
  - Use multifactor authentication or network level authentication and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**
  - Use Windows Defender Firewall
  - Enable tamper protection

[25] *Id.*

- Enable cloud-delivered protection
- Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications.[26]

63. Similarly, Defendant could and should have implemented measures—as also recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- Know what personal information you have in your files and on your computers.

- Keep only what you need for your business.

- Protect the information that you keep. Properly dispose of information you no longer need. Create a plan to respond to security incidents.[27]

64. Finally, Defendant could and should have implemented the following measures—as also recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- **Conduct regular vulnerability scanning to identify and address vulnerabilities**, especially those on internet-facing devices, to limit the attack surface.

- **Regularly patch and update software and operating systems to the latest available versions.** Prioritize timely patching of internet-facing servers that operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities.

- **Limit the use of RDP and other remote desktop services.** If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client.

- **Ensure all on-premises, cloud services, mobile, and personal devices are properly configured, and security features are enabled**. For example, disable ports and protocols that are not being

[26] *See* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.
[27] *See* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

used for business purposes.[28]

65. Given that Defendant was collecting, storing, and transferring troves of Private Information belonging to Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

66. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks or ransomware attacks, resulting in the Data Breach and data thieves accessing and acquiring Plaintiff's and millions of Class Members' Private Information.

**D. Defendant Acquires, Collects, and Stores Plaintiff's and Class Members' Private Information**

67. Defendant acquires, collects, and stores a significant amount of Private Information belonging to Plaintiff and Class Members.

68. As a condition of receiving products and services from Defendant, Plaintiff and Class Members were required to entrust their highly sensitive Private Information to Defendant.

69. By obtaining, collecting, and using Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized access and disclosure.

70. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a commitment to safeguard that information.

71. Upon information and belief, while collecting Private Information from Plaintiff and Class Members, Defendant promised to provide confidentiality and adequate data security through its applicable privacy statements and through other disclosures in compliance with statutory privacy requirements.

---

[28] *See* https://www.cisa.gov/resources-tools/resources/stopransomware-guide.

72. Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use their information for business purposes only, and to make only authorized disclosures of their information. The Data Breach occurred because Defendant failed to do so.

**E. Defendant Violated its Statutory and Regulatory Obligations to Protect Plaintiff's and Class Members' Private Information**

73. Defendant knew, or reasonably should have known, the importance of safeguarding the Private Information entrusted to it and of the foreseeable consequences of a breach of the security of its computer network. Defendant was on notice that it should and could have prevented this attack by properly securing and encrypting the Private Information stored on its systems and taking the steps outlined above to prevent infiltration by methods such as phishing by, for example, using multi-factor authentication methods.

74. Defendant failed to take appropriate preventive actions to protect Plaintiff's and Class Members' Private Information from unauthorized access and disclosure, in violation of its obligations, as a covered entity, under both the laws set forth herein and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 45 C.F.R. § 160.102, and all HIPAA Administrative Simplification Regulations in effect on January 1, 2012, contained in Parts 160, 162, and 164 of Title 45 of the Code of Federal Regulations, and Part 2 of Title 42 of the Code of Federal Regulations, including, but not limited to: (a) developing and implementing security policies and procedures; and (b) encrypting the information or records, and protecting against the release or use of the encryption key and passwords, or transmitting the information or records in a manner designed to provide equal or greater protections against improper disclosures.

75. Because Defendant is an entity covered by HIPAA, it is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R.

Part 160 and Part 164, Subparts A and C, which establish national security standards and duties for Defendant's protection of PII and PHI maintained by them in electronic form.

76. HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" with respect to "electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is defined as "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

77. HIPAA's Security Rule requires Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic protected health information it creates, receives, maintains, or transmits; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (d) ensure compliance by its workforce.

78. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and also to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

79. The Data Breach meets the HIPAA Security Rule's definition of a "reasonably anticipated" threat or hazard to the security or integrity of Plaintiff's and Class Members' Private Information. Similar cyberattacks have become so notorious that multiple government agencies and Mandiant have issued multiple warnings to potential targets, like Defendant, and published detailed recommendations to help companies prepare for cyberattacks and comply with their statutory and regulatory obligations. According to the cybersecurity firm Mimecast, 90% of healthcare organizations had experienced cyberattacks in the year of the FBI's report.[29]

[29] *See* Mimecast Research: 90 Percent of Healthcare Organizations Hit with an Email-Borne

80. The healthcare industry, in particular, has recently experienced a large number of high-profile cyberattacks, placing Defendant on notice of the need to ensure its systems were not vulnerable to such attacks. Cybersecurity breaches hit an all-time high in 2023, exposing a record amount of patient PHI. In 2023, 106 million individuals were affected by healthcare attacks, up from 44 million people in 2022.[30]

81. Due to the high-profile nature of these data breaches, Defendant either was or reasonably should have been on heightened notice of the threat of attacks occurring in the healthcare industry and, therefore, should have been on notice of its statutory and regulatory duties to protect against such attacks by diligently overseeing, preparing for, and immediately responding to such an attack.

82. By the time of this cyberattack, Defendant should have been aware that ransomware attacks were on the upswing: "In 2022 [cyber-security firm Blackfog] recorded a total of 376 attacks, a 29% increase over 2021 and 34% increase from 2020. Key take aways from these overall numbers is that 89% of all attacks now involve data exfiltration, 9% more than in 2021. From a tactical point of view we also saw an increase in the use of PowerShell, now at 87% of all attacks, a 7% increase from 2021 . . . . the Dark Web was used in 23% of all attacks, a dramatic increase from 5% in 2021."[31]

83. Despite the prevalence of public announcements alerting Defendant to the risks presented to Plaintiff and Class Members, Defendant failed to take appropriate steps to comply with its statutory and regulatory duties to protect Plaintiff's and Class Members' Private Information.

---

Attack in the Past Year, Nasdaq (Mar. 10, 2020) https://www.nasdaq.com/press-release/mimecast-research:-90-percent-of-healthcare-organizations-hit-with-an-email-borne.

[30] *Healthcare cyberattacks have affected more than 100 million people in 2023*, December 18, 2023, https://www.chiefhealthcareexecutive.com/view/health-data-cyberattacks-have-affected-more-than-100-million-people-in-2023.

[31] 2022 Ransomware Attack Report, BlackFog (January 20, 2023), www.blackfog.com/2022-ransomware-attack-report/.

84. Defendant failed to comply with HIPAA Rules, and the Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to implement safeguards mandated by HIPAA regulations, including, but not limited to, the following:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant creates, receives, maintains, and transmits, in violation of 45 C.F.R. section 164.306(a)(1);

b. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights such as by the use of multi factor authentication, in violation of 45 C.F.R. section 164.312(a)(1);

c. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. section 164.308(a)(1);

d. Failing to identify and respond to suspected or known security incidents and mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. section 164.308(a)(6)(ii);

e. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. section 164.306(a)(2);

f. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. section 164.306(a)(3);

g. Failing to ensure compliance with HIPAA security standard rules by its workforce by providing for adequate comprehensive training rather than simply using training software to test staff by imitating phishing emails, in violation of 45 C.F.R. section 164.306(a)(4);

h. Impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. section 164.502, *et seq.*;

i. Failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out its functions and to maintain security of PHI beyond simply using training software to test staff by imitating phishing emails, in violation of 45 C.F.R. sections 164.530(b) and 164.308(a)(5); and

j. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

85. Defendant also violated its duties under the FTC Act. The FTC pursuant to that Act and regulations promulgated thereunder has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" that violates the FTC Act.

86. According to the FTC, the need for data security should be factored into all business decision-making.[32] To that end, the FTC has issued numerous guidelines identifying data-security practices that businesses, like Defendant, should employ to protect against the unlawful exfiltration of PII and PHI.

87. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[33] The guidelines explain that businesses should:

a. protect the personal customer information that it keeps;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand its network's vulnerabilities; and

e. implement policies to correct security problems.

88. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

89. The FTC recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious

[32] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Nov. 2015), bit.ly/3uSoYWF.
[33] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), bit.ly/3u9mzre.

activity on the network; and verify that third-party service providers have implemented reasonable security measures.[34]

90. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

91. These FTC enforcement actions include actions against healthcare providers and partners like Defendant. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

92. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information stored on its systems constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

93. The applicable FTC rules, regulations, and guidelines obligate businesses, like Defendant, to protect Private Information from unauthorized access or disclosure by unauthorized persons.

94. At all relevant times, Defendant was fully aware of its obligation to protect Plaintiff's and Class Members' Private Information because it is a sophisticated business entity in the business of collecting, maintaining and storing Private Information.

95. Defendant was also aware of the significant consequences of its failure to protect PII and PHI for the millions of Class Members who entrusted their Private Information to Defendant, and knew that this data, if hacked, would injure Plaintiff and Class Members.

---

[34] *See Start with Security*, *supra*.

96. Defendant failed to comply with applicable FTC rules, regulations and guidelines, and industry standards concerning the protection and security of PII and PHI. As evidenced by the scope and nature of the Data Breach, among its many deficient practices, Defendant failed in, *inter alia*, the following respects:

a. Developing and employing adequate intrusion detection systems;

b. Engaging in regular reviews of audit logs and authentication records;

c. Developing and maintaining adequate data security systems to reduce the risk of data breaches and cyberattacks;

d. Ensuring the confidentiality and integrity of current and former customers' PII and PHI that Defendant receives and maintains;

e. Protecting against any reasonably anticipated threats or hazards to the security or integrity of its current and former customers' PII and PHI;

f. Implementing policies and procedures to prevent, detect, contain, and correct security violations;

g. Developing adequate policies and procedures to regularly review records of system activity, such as audit logs, access reports, and security incident tracking reports;

h. Implementing technical policies, procedures and safeguards for electronically stored information concerning PII and PHI that permit access for only those persons or programs that have specifically been granted access; and

i. Other similar measures to protect the security and confidentiality of its current and former customers' PII and PHI.

97. Had Defendant implemented the above-described data security protocols, policies, and/or procedures, the consequences of the Data Breach could have been avoided or greatly reduced. Defendant could have prevented or detected the Data Breach prior to the hackers accessing Defendant's systems and extracting sensitive and personal information; the amount and/or types of Private Information accessed by the hackers could have been avoided or greatly reduced; and Plaintiff and Class Members would have been notified, allowing them to promptly take protective and mitigating actions.

98. Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant also owed a duty to Plaintiff and Class Members to provide reasonable security in compliance with industry standards and state and federal requirements, and to ensure that its computer systems, networks, and protocols adequately protected Private Information from unauthorized access and disclosure. Defendant also had a duty to Plaintiff and Class Members to design, maintain, and test its computer systems to ensure that the Private Information in its possession was adequately secured and protected; to create and implement reasonable data security practices and procedures to protect the Private Information in its possession and avoid access to its systems through processes such as vishing, including adequately training employees and others who accessed information within its systems on how to adequately protect Private Information; to avoid permitting such infiltration such as by use of multi-factor authentication; to implement processes that would detect a breach of its data security systems in a timely manner and to act upon data security warnings and alerts in a timely fashion; to promptly and fully disclose if its computer systems and data security practices was inadequate to safeguard individuals' Private Information from theft or exfiltration; and to disclose in a timely and accurate manner when data breaches or cyberattacks occurred.

99. Defendant owed these duties to Plaintiff and Class Members because the Data Breach was foreseeable and they were the probable victims of any inadequate data security practices. Defendant affirmatively chose to design its systems with inadequate user authentication, security protocols and privileges, and set up faulty patching and updating protocols and backup systems. These affirmative decisions resulted in unauthorized parties being able to execute the Data Breach and exfiltrate the data in question, to the injury and detriment of Plaintiff and Class Members. By taking affirmative acts that left Defendant's computer systems vulnerable to such an attack, Defendant disclosed and permitted the disclosure of Plaintiff's and Class Members' Private

Information to unauthorized third parties. Through such actions or inactions, Defendant failed to preserve the confidentiality of the Private Information it was duty-bound to protect.

100. Defendant represented that it cared about data security and the safeguarding of Plaintiff's and Class Members' Private Information, and it represented that it would keep Plaintiff's and Class Members' Private Information secure and confidential.

101. Plaintiff and Class Members entrusted their Private Information to Defendant with the reasonable understanding that Defendant would keep its promises and self-imposed obligations to keep Private Information confidential, and to secure the Private Information stored on its systems from unauthorized access by malevolent actors. Defendant failed to do so.

102. The occurrence of the Data Breach, and the volume of data exfiltrated, demonstrates that Defendant failed to adequately safeguard Private Information by, *inter alia,* maintaining an adequate data security environment to reduce the risk of a data breach; periodically auditing its security systems to discover intrusions like the Data Breach; adequately training its employees; and implementing appropriate MFA.

103. Had Defendant undertaken the actions that federal and state law require, the Data Breach could have been prevented or the consequences of the Data Breach significantly reduced, as Defendant would have detected the Data Breach prior to the hackers extracting data from Defendant's networks, and Defendant's patients and customers would have been notified of the Data Breach sooner, allowing them to take necessary protective or mitigating measures much earlier.

**F. Value of Private Information**

104. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[35] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security

[35] 17 C.F.R. § 248.201 (2013).

number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[36]

105. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[37]

106. As the FTC has warned, the theft of PHI is also gravely serious because "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[38]

107. The greater efficiency of electronic health records brings increased risk of data breaches because cybercriminals recognize these records contain a significant trove of sensitive information (e.g., patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.). A single patient's complete record can be sold for hundreds of dollars on the dark web.

108. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[39] Indeed, during 2019 alone, over 41 million healthcare records was exposed, stolen, or unlawfully disclosed in 505 data breaches.[40] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[41]

109. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy

---

[36] *Id.*
[37] *See* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.
[38] https://www.usatoday.com/story/money/personalfinance/2015/03/28/the-new-kind-of-identity-theft-you-havent-heard-of/25091257/.
[39] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/.
[40] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/.
[41] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/.

Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to its personal medical files due to the thief's activities."[42]

110. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft was forced to pay out-of-pocket costs for healthcare it did not receive to restore coverage.[43] Almost half of medical identity theft victims lose its healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw its insurance premiums rise, and 40 percent was never able to resolve its identity theft at all.[44]

111. This data, as one would expect, demands a much higher price on the black market than financial data alone. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[45]

112. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information at the point-of-sale in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, Social Security numbers, or other government issued identification numbers.

113. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

---

[42] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.

[43] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[44] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/.

[45] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

114. When combined with other publicly available data, any PII element can be used to build full identity profiles, known as "Fullz" packages, which are frequently exploited in financial fraud schemes. "Fullz" is fraudster-speak for data that includes a victim's information, including name, address, SSN, date of birth, and more.

115. With Fullz packages, cybercriminals can cross-reference two (or more) sources of PII to marry unregulated data available elsewhere (e.g., address or phone number) to criminally stolen data to assemble shockingly accurate and complete dossiers on individuals.

116. Compromised Private Information, whether alone or as part of a Fullz package, is highly valuable to cybercriminals, who can use it to engage in a wide range of fraudulent activities, including committing unemployment insurance fraud, opening unauthorized financial accounts, and applying for government benefits.

117. This type of identity theft renders any compromised data—including seemingly innocuous PII, such as name and contact information—valuable. In the wrong hands, up-to-date names, addresses, phone numbers, and email addresses can be used to update, validate, and verify Fullz packages, which can then be used for nefarious purposes.

118. For example, a criminal actor can use an up-to-date Fullz package to bypass identity verification tools—which are often used in financial transactions (like loan applications), background checks, etc.—without detection. In a typical identity verification system, a user submits its PII, like its name, addresses, or date of birth. That customer-submitted PII is then cross-checked against "a trusted data set," including those from "credit bureaus, official government documents or mobile operator databases."

119. Thus, with an up-to-date Fullz package—which might include seemingly harmless information, like the identity theft victim's name and current address—a cybercriminal has the victim's up-to-date PII, which will match the victim's information from trusted data sources, like the credit bureaus. With this information, the criminal can then successfully pass identity verification systems without raising any red flags. In this way, Fullz packages, which are made possible by up-to-date and compromised elements of PII, enable fraudsters to carry out various forms of identity theft, including taking out fraudulent loans.

120. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[46]

121. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**G. Defendant Owed a Duty of Care to Plaintiff and Class Members**

122. Plaintiff's and Class Members' Private Information was stored on Defendant's platforms, networks, systems or products at the time of the Data Breach.

123. Defendant owed common law duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in Defendant's possession from being compromised, accessed, stolen, or misused by unauthorized parties.

**i. Defendant Breached its Duty of Care to Plaintiff and Class Members**

124. Defendant's duty of reasonable care is established due to the nature of its business, which is to provide *secure* healthcare services to patients, and store massive amounts of data, including Plaintiff's and Class Members' Private Information. In offering and undertaking these services, Defendant assumed a duty to exercise reasonable care to safeguard Plaintiff's and Class Members' Private Information because it was foreseeable that failure to do so would cause them injury.

[46] *See* https://www.gao.gov/assets/gao-07-737.pdf.

125. Defendant's duty of reasonable care is established by governmental regulations and industry guidance establishing industry standards for data security to safeguard the Private Information it stored.

126. Defendant's duty of reasonable care is also established by its own marketing and privacy statements, which hold out its secure provision of services.

127. Defendant's duty of reasonable care is also established by relevant common law.

128. Defendant breached its duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information and by failing to implement adequate data security practices, which caused the Data Breach.

129. Defendant was negligent and breached its duty of care to Plaintiff and Class Members to protect their Private Information from unauthorized access and disclosure.

130. Defendant's breach of its duty of care caused the Data Breach, because if Defendant had maintained adequate data security, the Data Breach could have been prevented.

131. Defendant's data security failings also constitute an unfair trade practice. As discussed above, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security for Private Information violates the FTC Act's prohibition on "unfair and deceptive acts."

132. Defendant's breach of its duty of care and engagement in unfair trade practices caused injury to Plaintiff and Class Members.

133. Defendant is liable for the injuries suffered by Plaintiff and Class Members by virtue of its administration and control over the breached networks and systems, which stored Plaintiff's and Class Members' Private Information.

**ii. Plaintiff and Class Members have suffered injuries as a result of the Data Breach**

134. Plaintiff and Class Members have suffered the following forms of injury as a result of the Data Breach.

135. The Data Breach's disclosure of Plaintiff's and Class Members' Private Information has created a substantial risk that their data will be misused. This risk is demonstrated by the fact that cybercriminals now control that data.

136. The Ponemon Institute found that, on average, "health care identity theft victims spend nearly $13,500" to resolve complications and that victims often have to pay off imposters' fraudulent medical bills. In another study by the Ponemon Institute in 2015, 31% of medical identity theft victims lost their healthcare coverage, while 29% had to pay to restore their health coverage, and over half were unable to resolve the identity theft at all.

137. As a result of the recognized risk of identity theft when a data breach occurs, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

138. Due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their medical statements and financial accounts for many years to mitigate the risk of identity theft and fraud.

139. Plaintiff and Class Members have spent and will continue to spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, changing passwords, and contacting companies regarding suspicious activity on their accounts.

140. Plaintiff's and Class Members' mitigation efforts are consistent with the U.S. Government Accountability Office's 2007 report regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[47]

---

[47] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (Nov. 1207), https://www.gao.gov/new.items/d07737.pdf.

141. Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends that data breach victims take to protect their Private Information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals its identity), reviewing credit reports, contacting companies to remove fraudulent charges from accounts, placing a credit freeze on credit, and correcting credit reports.[48]

142. Plaintiff's mitigation efforts are also consistent with the steps Defendant recommended its customers take in the wake of the Data Breach, including: enrolling in credit monitoring, contacting police, and remaining vigilant to root out identity theft and fraud.

143. Plaintiff and Class Members also suffered lost property value in their Private Information when Defendant allowed their Private Information to fall into the hands of cybercriminals,[49] who will freely sell or distribute the stolen Private Information at any time.

144. Private Information is a valuable property right.[50] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

145. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[51]

146. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and

---

[48] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

[49] https://www.nychealthandhospitals.org/pressrelease/notice-of-data-breach/ (last visited August 4, 2026).

[50] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[51] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

provides it to marketers or app developers.[52, 53]

147. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[54]

148. Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[55]

149. According to Experian, one of the three major credit bureaus, medical records can be worth up to $1,000 per person on the dark web, depending upon completeness.

150. A robust cyber black market exists in which criminals post stolen Private Information on multiple underground Internet websites, commonly referred to as the dark web, to create fake insurance claims, purchase and resell medical equipment, or access prescriptions for illegal use or resale. Criminals often trade stolen Private Information on the "cyber black market" for years following a breach. For example, it is believed that certain PII and PHI compromised in the 2017 Experian data breach was being used three years later by identity thieves to apply for COVID-19-related benefits.[56] According to a 2017 Javelin strategy and research presentation, fraudulent activities using data stolen in data breaches between two and six years old had increased by nearly 400% over the previous 4 years.[57]

151. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. This transfer of value occurred without

---

[52] https://datacoup.com/.
[53] https://digi.me/what-is-digime/.
[54] Nielsen Computer & Mobile Panel, Frequently Asked Questions, *available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.
[55] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[56] Janelle Stecklein, *Director: 64,000-plus fraudulent unemployment claims 'mitigated'*, The Duncan Banner (June 24, 2020), https://www.duncanbanner.com/news/director-64-000-plus-fraudulent-unemployment-claims-mitigated/article_dc446671-73a6-5e8a-b732-bcedba72b458.html.
[57] *See*, Brian Stack, Here's How Much Your Personal Information is Selling for on the Dark Web (2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited August 4, 2026).

any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the stolen Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

152. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information stored on its systems.

153. Defendant breached its express and implied contractual commitments to Plaintiff and Class Members to protect their Private Information.

154. The breach of a contractual obligation constitutes an injury to Plaintiff and Class Members and provides a basis for a lawsuit to enforce the terms of the contract.

155. In breaching its contractual commitments, Defendant further injured Plaintiff and Class Members by depriving them of the benefit of the bargain they had reached.

156. Plaintiff and Class Members entered into agreements with Defendant based on express and implied representations that their Private Information would be protected—which was factored into the value of that exchange. Because Defendant failed to maintain reasonable data security measures to protect that Private Information, it deprived Plaintiff and Class Members of the benefit of their bargain.

157. Plaintiff and Class Members have also been injured by an invasion of their privacy rights.

158. In addition, Plaintiff and Class Members have suffered emotional distress and anxiety resulting from the Data Breach and the substantial risk of identity theft and loss of privacy. Plaintiff and Class Members understand that their Private Information cannot now be clawed back from the dark web.

**iii. Plaintiff's Individual Experience**

159. Plaintiff Steven Rose is a patient of Defendant.

160. As a condition of obtaining products and health services from NYC Health+, Plaintiff Rose was required to provide his Private Information to NYC Health+.

161. Defendant was in possession of Plaintiff Rose's Private Information before, during, and after the Data Breach.

162. Because of the Data Breach, Plaintiff Rose's confidential Private Information is now in the hands of cybercriminals. As such, Plaintiff Rose and other Class Members are at imminent risk of identity theft and fraud.

163. As a result of the Data Breach, Plaintiff Rose has and will expend hours of his time and loss of productivity addressing and attempting to ameliorate, and mitigate, the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft in order to prevent, *inter alia*, having medical services and products billed in his name, loans opened in his name, tax returns filed in his name, utility bills opened in his name, and credit card accounts opened in his name.

164. Plaintiff Rose places significant value on the security of his Private Information and does not readily disclose it. Plaintiff Rose has never knowingly transmitted Private Information over the internet or any other unsecured source. Plaintiff Rose would not have entrusted his Private Information to Defendant NYC Health+ had he known of Defendant's inadequate data security policies.

165. Plaintiff Rose has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach.

166. Plaintiff Rose has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff Rose's and Class Members' Private Information will be wholly unprotected and at risk of future data breaches.

167. Plaintiff Rose suffered actual injury as a result of the unauthorized access and disclosure of his Private Information in the Data Breach including, but not limited to: (i) actual fraud; (ii) invasion of privacy; (iii) disclosure and/or theft of his Private Information; (iv) lost or

diminished value of his Private Information; (v) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) an increase in spam and phishing communications; (vii) nominal damages; and (viii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant' possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect his Private Information.

168. After receiving notice from NYC Health+ that his Private Information was compromised in the Data Breach, Plaintiff Rose has also suffered fear, anxiety, and stress.

## CLASS ACTION ALLEGATIONS

169. Plaintiff brings this action on behalf of himself, and on behalf of the following nationwide Class:

> All current and former NYC Health+ patients, customers and employees residing in the United States whose data was accessed or stolen in the Data Breach.

170. Excluded from the Class are Defendant's officers, directors, and any entity in which Defendant has a controlling interest, and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

171. Plaintiff reserves the right to amend or modify the definition of the Class or create subclasses as this case progresses.

172. **Numerosity.** The members of the Class are so numerous that joinder of all of them is impracticable. Defendant serves tens of millions of customers throughout the United States.

173. **Commonality.** There are questions of fact and law common to the Class, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

- Whether Defendant had a duty to protect Plaintiff's and Class Members' Private Information, and whether it breached that duty.

- Whether Defendant knew or should have known that its data security practices were deficient.
- Whether Defendant's data security systems were consistent with industry standards prior to the Data Breach.
- Whether Plaintiff and Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, nominal damages, and/or injunctive relief.

174. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

175. **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

176. **Predominance.** Defendant engaged in a common course of conduct toward Plaintiff and Class Members, in that their data was stored on the same networks and systems and was unlawfully accessed in the same manner. The common issues arising from Defendant's conduct affecting Class Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

177. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Class. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. To conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

178. Defendant has acted on grounds that apply generally to the Class as a whole, such that injunctive relief, and declaratory relief are appropriate on a classwide basis.

179. Likewise, particular issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such particular issues include, but are not limited to:

- Whether Defendant owed a legal duty to Plaintiff and Class Members to protect their Private Information.
- Whether Defendant's data security measures were inadequate in light of applicable regulations and industry standards.
- Whether Defendant's data security measures were negligent.

180. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and contact information of Class Members affected by the Data Breach.

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE
### (On behalf of the Plaintiff and the Class)

181. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

182. Defendant required Plaintiff and Class Members to entrust it with their Private Information as a condition of obtaining products and services from Defendant, or employment with Defendant.

183. Plaintiff and Class Members entrusted their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would safeguard their Private Information and delete it once the relationship terminated.

184. By assuming the responsibility to maintain and store Plaintiff's and Class Members' Private Information, and in fact doing so, and sharing it and using it for commercial gain, Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, and safeguarding the Private Information in its possession from being compromised, stolen, or misused by unauthorized persons, and to secure

and safeguard its computer property. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the event of a data breach.

185. Specifically, Defendant's duty included, among other things: (a) implementing industry standard data security safeguards to protect Plaintiff's and Class Members' Private Information; (b) maintaining, testing, and monitoring Defendant's security systems to ensure that Private Information was adequately secured and protected; (c) implementing intrusion detection systems and timely notifying customers of suspicious intrusions; (d) ensuring any third party software products to which it entrusted Plaintiff's and Class Members' Private Information was adequately and reasonably secure and was not vulnerable to exploitation; and (e) adequately notifying Plaintiff and Class Members about the types of data that was compromised in the Data Breach.

186. Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

187. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

188. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

189. Defendant also had a common law duty to prevent foreseeable harm to others. This duty existed because Defendant stored valuable Private Information that is routinely targeted by

cybercriminals. Plaintiff and Class Members were the foreseeable and probable victims of any compromise to inadequate data security practices maintained by Defendant.

190. Defendant further assumed a duty of reasonable care in making representations in marketing materials and its Privacy Policy concerning data security.

191. Defendant breached its duty to Plaintiff and Class Members, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failure to adequately train its employees to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Plaintiff's and Class Members' Private Information;

e. Failing to detect in a timely manner that Plaintiff's and Class Members' Private Information had been compromised;

f. Failing to remove Plaintiff's and Class Members' Private Information after it was no longer required to retain it pursuant to regulations;

g. Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach's occurrence and scope, so they could take appropriate steps to mitigate the potential for identity theft and other damages; and

h. Failing to ensure any third-party vendor or software it used was adequately and reasonably secure to protect Plaintiff's and Class Members' Private Information.

192. Defendant violated Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Private Information and not complying with applicable industry

standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

193. Plaintiff and the Class are within the class of persons that the FTC Act and HIPAA were intended to protect.

194. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act and HIPAA were intended to guard against.

195. Defendant's violation of Section 5 of the FTC Act and HIPAA constitutes negligence.

196. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

197. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate data security practices.

198. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the Data Breach was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

199. Defendant has full knowledge of the sensitivity of the Private Information stored on its systems and the types of harm that Plaintiff and the Class could and would suffer if their Private Information was wrongfully disclosed.

200. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing Plaintiff's and Class Members' Private Information, the critical importance of providing adequate security, and the necessity for encrypting Private Information stored on Defendant's systems.

201. It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in one or more types of injuries to Plaintiff and Class Members.

202. Plaintiff and Class Members had no ability to protect their Private Information that was in, and remains in, Defendant's possession.

203. Defendant was in an exclusive position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

204. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

205. Defendant has admitted that Plaintiff's and Class Members' Private Information was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

206. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, Plaintiff's and Class Members' Private Information would not have been compromised.

207. There is a close causal connection between Defendant's failure to implement adequate data security measures to protect Plaintiff's and Class Members' Private Information and the harm, or risk of imminent harm suffered by Plaintiff and the Class. Plaintiff's and Class Members' Private Information was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

208. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the

Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information stored on its systems.

209. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

210. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risk of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

211. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

212. Defendant's negligent conduct is ongoing, in that it still holds Plaintiff's and Class Members' Private Information in an unsafe and insecure manner.

213. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II – BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Class)**

214. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth

herein.

215. As a condition of obtaining products and services from Defendant, or employment with Defendant, Defendant required Plaintiff and Class Members to entrust it with their Private Information.

216. In mandating that Plaintiff and Class Members provide their Private Information, Defendant implied an assent to safeguard and protect their Private Information.

217. Plaintiff and Class Members provided their Private Information to Defendant in exchange for (among other things) Defendant's promise to protect their Private Information from unauthorized disclosure and to delete it once it was no longer necessary for business purposes. Defendant additionally promulgated, adopted, and implemented a written privacy policy whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

218. On information and belief, Defendant further promised to and represented it would comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

219. Implicit in the agreement between Plaintiff and Class Members and Defendant, was Defendant' obligation to: (a) use Private Information for business purposes only; (b) take reasonable steps to safeguard that Private Information; (c) prevent unauthorized disclosures of the Private Information; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information; (e) reasonably safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized disclosure or uses; (f) retain Private Information only under conditions that kept such information secure and confidential.

220. When Plaintiff and Class Members provided their Private Information to Defendant as a condition of obtaining services from or employment with Defendant, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

221. Defendant required Plaintiff and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

222. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

223. Plaintiff and Class Members would not have provided their Private Information to Defendant had they known that Defendant would not safeguard their Private Information as promised. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

224. Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

225. Defendant breached its implied contracts with Plaintiff and Class Members by failing to safeguard their Private Information.

226. As a direct and proximate result of Defendant's breach of implied contract, Plaintiff and Class Members have suffered injuries in fact including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) actual misuse of the compromised data; (vi) nominal damages; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

227. As a direct and proximate result of Defendant's breach of implied contract, Plaintiff and Class Members are entitled to damages, including compensatory damages, punitive damages, and/or nominal damages, in an amount to be proven at trial.

228. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT III – UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

229. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

230. Plaintiff brings this Count in the alternative to Count II above.

231. Plaintiff and Class Members conferred a monetary benefit on Defendant by providing payments to Defendant (directly or indirectly), as well as by providing their valuable Private Information to Defendant.

232. Plaintiff and Class Members entrusted Defendant with their Private Information with the reasonable expectation and mutual understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices from the revenue derived therefrom. In exchange, Plaintiff and Class Members should have received adequate protection and data security for such Private Information held by Defendant.

233. Upon information and belief, Defendant funds any data security measures it implements entirely from its general revenues, including from money it makes (including that supplied by contractual payments directly or indirectly by Plaintiff and Class Members) based upon representations of protecting Private Information.

234. Thus, there is a direct nexus between money paid to Defendant and the requirement that Defendant keep Private Information confidential and protected.

235. Plaintiff and Class Members paid Defendant, directly or indirectly, a certain sum of money, which was used to fund any data security measures implemented by Defendant.

236. As such, a portion of the payments made by Plaintiff and Class Members (or made on their behalf) is to be allocated to and used to provide a reasonable and adequate level of data

security, the amount of which is known to Defendant.

237. Defendant benefited from receiving Plaintiff's and Class Members' payments for services, whether directly or indirectly, and from receiving their Private Information through its ability to retain and use that information for its own benefit. Defendant understood and accepted this benefit.

238. Defendant knew Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used Plaintiff's and Class Members' Private Information for business purposes.

239. Protecting Private Information is integral to Defendant's business. Without Private Information, Defendant would be unable to provide the services and products which comprise Defendant's core business.

240. Plaintiff's and Class Members' Private Information have monetary value. Thus, Plaintiff and Class Members conferred a monetary benefit on Defendant.

241. Defendant also understood and appreciated that Plaintiff's and Class Members' Private Information was highly sensitive and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

242. Defendant collected and stored the Private Information provided by Plaintiff and Class Members. In exchange, Plaintiff and Class Members should have received from Defendant the services that comprise Defendant's business and should have had their Private Information protected with adequate data security.

243. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from the Private Information provided by Plaintiff and Class Members and used their Private Information for business purposes.

244. Defendant failed to secure Plaintiff's and Class Members' Private Information, and, therefore, did not fully compensate Plaintiff and Class Members for the value that their Private Information provided.

245. If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information to Defendant or obtained services from Defendant.

246. Plaintiff and Class Members have no adequate remedy at law.

247. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decisions to prioritize its own profits over the requisite data security and the safety of Plaintiff's and Class Members' Private Information.

248. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

249. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) actual misuse of the compromised data; (vi) nominal damages; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

250. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other

compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

251. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV – INVASION OF PRIVACY/INTRUSION UPON SECLUSION**
**(On behalf of Plaintiff and the Class)**

252. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

253. Defendant intentionally intruded into a matter as to which Plaintiff and Class Members had a reasonable expectation of privacy, and that intrusion was highly offensive to a reasonable person.

254. Defendant intentionally intruded upon the solitude, seclusion and private affairs of Plaintiff and Class Members by intentionally configuring its systems in such a way that left them vulnerable to a cyberattack, thus permitting unauthorized access to its systems, which compromised Plaintiff's and Class Members' Private Information. Only Defendant had control over its systems.

255. At all times, Defendant was aware that Plaintiff's and Class Members' Private Information in its possession contained highly sensitive and confidential Private Information.

256. Plaintiff and Class Members have a reasonable expectation of privacy in their PII and PHI, which also contains highly sensitive medical information.

257. Defendant intentionally configured its systems in such a way that stored Plaintiff's and Class Members' Private Information to be left vulnerable to cyberattack without regard for Plaintiff's and Class Members' privacy interests.

258. The disclosure of the sensitive and confidential Private Information of Plaintiff and millions of Class Members was highly offensive to Plaintiff and Class Members because it violated

expectations of privacy that have been established by general social norms, including by granting access to information and data that is private and would not otherwise be disclosed.

259. Defendant's conduct would be highly offensive to a reasonable person in that it violated statutory and regulatory protections designed to protect highly sensitive information, in addition to social norms. Defendant's conduct would be especially egregious to a reasonable person as Defendant publicly disclosed Plaintiff's and Class Members' sensitive and confidential personal information, without their consent, to an "unauthorized person," i.e., hackers.

260. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

261. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's intrusion upon seclusion and are entitled to just compensation.

262. Plaintiff and Class Members are entitled to appropriate relief, including compensatory damages for the harm to their privacy, loss of valuable rights and protections, and heightened stress, fear, anxiety and risk of future invasions of privacy.

**COUNT V – NEW YORK GENERAL BUSINESS LAW**
**(On behalf of Plaintiff and the Class)**

263. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

264. Defendant engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, including:

(a) Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's Private Information, which was a direct and proximate cause of the Data Breach;

(b) Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data

Breach;

(c) Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

(d) Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's Private Information, including by implementing and maintaining reasonable security measures;

(e) Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

(f) Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's Private Information; and

(a) Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

265. Plaintiff was deceived in New York. He also transacted with Defendant in New York by using Defendant's products and services in New York.

266. Defendant's representations and omissions were material because they were likely to deceive Plaintiff and Class Members about the adequacy of Defendant's data security and ability to protect the confidentiality of Plaintiff's and Class Members' Private Information.

267. Defendant acted intentionally, knowingly, and maliciously to violate New York's General Business Law and recklessly disregarded Plaintiff's and Class Members' rights. Defendant (1) represented in its information privacy and confidentiality policies that it was implementing reasonable security measures to protect Plaintiff's and Class Members' sensitive Private Information and (2) failed to implement reasonable data security measures.

268. As a direct and proximate result of Defendant's deceptive and unlawful acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury,

ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendant, since they would not have paid Defendant for goods and services or would have paid less for such goods and services but for Defendant's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing identification documents; loss of value of their Private Information; and an increased, imminent risk of fraud and identity theft.

269. Defendant's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the millions of New Yorkers affected by the Data Breach. Defendant's above-described deceptive and unlawful practices and acts caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid.

270. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, restitution, injunctive relief, and attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, request judgment against Defendant and that the Court grant the following:

A. An Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

B. Equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information;

C. Injunctive relief, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge Plaintiff's and Class Members' Private Information, unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to pay out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of Plaintiff's and Class Members' Private Information, for Plaintiff's and Class Members' lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' Private Information;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's networks is compromised, hackers cannot gain access to portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiff and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and how to respond to a breach;

xiii. requiring Defendant to implement testing systems to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, and randomly and periodically testing employees' compliance with Defendant' policies, programs, and systems for protecting Private Information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for internal and external threats, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to unauthorized third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any

deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, statutory, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: August 10, 2026

Respectfully submitted,

Ashley M. Crooks
N.Y. Bar No. 5800776
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
T: (646) 357-1100
F: (202) 540-7201
E: acrooks@hausfeld.com

James J. Pizzirusso*
**HAUSFELD LLP**
1200 17th Street, N.W., Suite 600
Washington, D.C. 20036
T: (202) 540-7200
F: (202) 540-7201
E: jpizzirusso@hausfeld.com

**Pro Hac Vice Forthcoming*